### MUDD et al. v. PERRY.

No. 15655—Opinion Filed Feb. 17, 1925.

Dissenting Opinion, Feb. 28, 1925.

Rehearing Denied April 21, 1925.

(Syllabus.)

1. **Marriage'— Common-Law Marriage—Essentials.**

Marriage as at common law creates the status of husband and wife under the law of this state. Whenever the minds of the parties meet in a common consent thereto, the marriage immediately arises. It is a contract between the man and woman, each accepting the other into the ties of that relation, neither remiss to its possible sorrows, nor the enjoyment of its incidental pleasures. The status is created by the contract, by whatsoever evidential facts it may be established if questioned.

2. **Appeal and Error — Harmless Error — Amendment to Petition for Distribution.**

Though an amendment allowed by the dis-

trict court to a petition filed for distribution in the county court may be technically erroneous, if it merely pleads evidential facts of a status as an heir of a decedent, which status was plainly asserted in the original petition, such alleged error is not prejudicial.

3. **Descent and Distribution—Probate Jurisdiction — Heirship of Common-Law Husband—Effect of Decree.**

When the husband applies under sections 1354 to 1358, inclusive. Comp. Stat. 1921, for distribution of the estate of his deceased wife, who is survived by no descendants, and certain collateral heirs draw in question the lawfulness of the matrimonial status asserted, for the purpose of defeating the distribution to him as prayed, the county court in probate and the district court in probate on appeal, can try this issue, as necessarily incident to the exercise of the power of distribution. under said sections, but the decree of neither court is one of final determination of heirship, in the sense set out in sections 1359 and 1384 to 1388, inclusive. It is binding and conclusive only as between the parties before the court. while the decree of heirship rendered by following the last named sections is binding and conclusive as against the world.

4. **Marriage—Common-Law Marriage—Bona Fide Relation After Removal of Disability—Heirship of Common-Law Husband Sustained.**

Samuel A. Perry and Lucy Lotson Beaver were formally married. when the latter was under a disability, because a decree of divorce granted her had not become effective by the lapse of six months. Both intended in good faith to assume the marital relation. After the said disability was removed, they continued to live together as husband and wife without a formal marriage ceremony. Held, that. under the record in this case, the facts occurring after this disability was removed and by the record established were sufficient to give rise to a marriage as at common law, and to make them husband and wife.

Held, further. that the order and judgment from which the appeal herein is taken, directing a distribution to the appellee as the lawful husband of the decedent, is without error and is affirmed.

Error from District Court, Craig County; A. C Brewster, Judge.

From a decree of distribution of estate of Lucy Lotson Perry, deceased, in favor of Samuel A. Perry, in district court on appeal from county court, Alex Mudd and another bring error. Affirmed.

O. L. Rider, F. W. Church, E. C. Fitz-

gerald, and T. A. Chandler, for plaintiffs in error.

Chas. B. Rogers, for defendant in error.

BRANSON, V. C. J. This proceeding is to reverse a judgment of the district court of Craig county, rendered on the 1st day of March, 1924, as supplemented on the 21st day of April thereafter. The judgment of the district court was rendered in the exercise of its jurisdiction on appeals from matters probate from the county court of said county. When filed in this court, the appellants were Alex Mudd and Maude Lee Mudd. Since this appeal was filed, Maude Lee Mudd has secured an order from this court dismissing the appeal as to herself, and as the matter now stands, the appeal is prosecuted by Alex Mudd. The cause had its origin in the county court of said county by the said Alex Mudd and Maude Lee Mudd seeking a distribution of the estate of one Lucy Lotson Perry, deceased.

Under the provisions of sections 1354 to 1358, Comp. Stats. 1921, the said Alex Mudd and Maude Lee Mudd pleaded that the said Lucy Lotson Perry died May 21, 1922; that more than 4 months had elapsed since the issuance of letters of administration; that the decedent left no descendant surviving her; that she left no husband, and that the said Alex Mudd was her brother, and the said Maude Lee Mudd was the daughter of a deceased brother of the said decedent; and prayed:

"Wherefore, your petitioners pray that this petition be set down for hearing; that notice of the same be given as provided in section 1355, of the Comp. Stats. 1921, and that upon the hearing of said petition, that the court order the distribution of said estate, leaving only such funds in the hands of the administrator as may be necessary to finish paying the debts and the cost of the administration."

Notice was given as provided in said section 1355, and one Samuel A. Perry, who is styled herein as the appellee, under section 1356, came into the same proceeding, denied their allegation that decedent left no husband, and made application for a distribution to himself, under said section 1354, of one-half of the estate of the said Lucy Lotson Perry, as the surviving husband of the said decedent, and that the remaining half be distributed equally between Alex Mudd and Maude Lee Mudd.

On hearing these applications, after the notice was duly given, as provided by law, a judgment of distribution was entered by the county court, from which an appeal was taken to the district court, and on trial in the district court, the judgment from which this appeal is perfected was entered. That judgment was in effect: "That at the time of her (decedent's) death, she was the lawful wife of Samuel A. Perry, who survived her. That Alex Mudd, a brother, and Maude Lee Mudd, a child of a deceased brother, also survived her." And further, that the said husband took one-half of the property ordered distributed and that Maude Lee Mudd took one-fourth, and that Alex Mudd took one-fourth. The judgment was conditioned, however, by the requirements set out in section 1357, Comp. Stats. 1921. The judgment was supplemented thereafter in substance requiring the county court, from which the cause was appealed, to carry the finding and judgment of the district court into effect.

Many assignments of error are made on behalf of the remaining appellant, but those which warrant discussion resolve themselves into few. One is that the district court had no power to enter the order of distribution in favor of Samuel A. Perry. Appellant's argument in support of this contention is centered around the case of In re Coyne's Estate, 103 Okla. 279, 229 Pac. 630. and is to the effect that under the sections of the statute, supra, authorizing the proceeding instituted in the county court of Craig county, a decree of heirship cannot be entered, for that a decree of heirship is exclusively authorized by sections 1359 and 1384 to 1388, Comp. Stats. 1921, inclusive.

On reading the syllabus in said case without analyzing it in connection with the facts as disclosed in the body of the opinion, the position of counsel could not be said to be taken without reason. In the Coyne Estate, however, the facts were such as not to justify the interpretation placed thereon which appellant seeks to give it, in support of his position. The decedent, Coyne, in that case did not die without issue surviving: but, on the contrary, left surviving him a daughter, whose whereabouts for a number of years had been unknown. This daughter, Mary Ellen, would have been the sole surviving heir, but not having been heard from for years, a brother, Thomas J. Coyne, acquired a decree of distribution to himself as heir, undertaking to pursue said section 1359 "on final distribution of estates," but as held by the court in said case, it was treated by the county court as being a substantial compliance with the provisions governing partial distribution (sections 1354 to 1357, inclusive, Comp. Stats. 1921).

The law announced in the syllabus in the

Coyne Case can be held to go only to the point that the daughter could not be excluded by the proceedings there, and the inheritance taken by her father's brother and paid, as administrator, to himself could not be retained by him, she having established her status as his daughter. It cannot be extended to the point of holding that under the partial distribution statutes, supra, the person who petitions for a partial distribution as an heir. that any dispute as to his relationship to the decedent or the amount of the estate he is entitled to receive, which may be raised by some other person, cannot be heard and tried by the court. The judgment entered on such hearing is conclusive as against all the parties before the court, but it does not operate as a decree of heirship in the sense that it excludes all other persons foreign to the proceedings for partial distribution who may afterwards come in and desire to be heard, under sections 1359 or 1384 to 1388, inclusive, Comp. Stats. 1921. But in the instant case, the petition for distribution by the appellee is on the ground that he was the lawful husband of the deceased. Under the statute, since it is admitted that decedent left surviving no descendants, he would receive as an heir one-half of her property, the remaining half to go in as many divisions as might on a determination of heirship be adjudged there were separate and distinct heirs. How many collaterals there might be to take the other half would not in any wise affect the husband's right to one-half of the property, if in fact he was the lawful husband. Apparently it was conceded by the appellant here, through counsel, in the district court that the issue of whether he was the lawful husband of the deceased was an issue properly triable there. For in the opening statement of counsel for the appellant here, it was stated, among other things:

"It is simply a case to determine whether or not Sam Perry is also entitled to share as an heir, and that right we deny, because there never was a valid marital relation existing."

It was not contended in the district court that the right to enter the order for Samuel Perry's part under the partial distribution statutes did not exist, if the court, on trying the facts which the brother and the niece of the deceased disputed, found that Samuel A. Perry was the lawful husband of the intestate. If the partial distribution sections (1354 to 1358, Comp. Stats. 1921) can be defeated by an heir or alleged heir claiming that the person who makes application under such provisions is not an heir. and the court has no power to try that issue under the proceedings in said sections provided for, an objection, whether in good or bad faith, would work a practical nullification of the jurisdiction conferred upon the county court by said sections.

The case relied upon by the appellant as stripping the court of the jurisdiction assumed only goes to the extent, when properly construed, of holding that the absent daughter, whose existence had been known and who would be the heir of her deceased father, if living, could not be excluded from claiming his property, unless sections 1359 or 1384 to 1388, Comp. Stats. 1921. were complied with. This person known to have been in esse, and known to have been the daughter of the decedent, precluded the brother from taking any share as an heir, if living, and she could not be barred from subsequently litigating her rights as against him, except by a decree of heirship determinative of the distributees as against the world, as provided by the said last-mentioned sections of the statute.

The contention made by appellant on this issue argued in the brief is in reason without merit. In the instant case, we have the alleged husband of the decedent coming into the same case where other alleged heirs made application for partial distribution, and also asking that distribution be made to himself. A decree of any sort ordering a distribution of funds, such as here, necessarily requires a finding that the person to whom it is directed to be made is in fact an heir. There is nothing in the statute which precludes the county court, or the district court on appeal, from hearing evidence, and finding facts, both as to whether the applicant is an heir at all, and if so, the amount of his interest. But in this statute there is nothing that makes such finding or judgment conclusive against the world as a decree of heirship, as under the subsequent sections of the statute. when final, it is. The husband, if found and determined to be such, would be entitled to one-half of the estate, it being conceded by all that Lucy Lotson Perry was survived by no descendants. The other one-half would go to collaterals, under our statute (section 11301, subd. 2). The determination that these petitioners should share in the estate would, under this proceeding, not be conclusive as against someone else who might, on determination of heirship in the strict sense of the term, establish a right to participate as an heir.

While in his brief appellant contends that

the court had no power or jurisdiction to hear a dispute as to the relationship of the alleged heir to the decedent, under the provisions of the statute here pursued, yet the right of the appellant himself to participate to the amount prayed, and as inheriting as claimed in his petition, along with his niece, Maude Lee Mudd, is vitally in dispute in the case, and yet one of the errors assigned by plaintiff in error's counsel is:

"15. That said court erred in refusing to order the whole of the estate of said deceased distributed to these plaintiffs in error in equal shares."

Should this court sustain this quoted assignment of error—and it can hardly be presumed that the plaintiff in error would make an assignment without desiring that the court sustain it—we would have to rule against the contention made in the brief as to the want of jurisdiction of the court to determine such a dispute.

Appellant again contends that the district court should not have permitted an amendment to appellee's petition for partial distribution. The amendment only went into greater detail as to the method and manner of the marriage between the appellee and the decedent. We think this amendment was wholly unnecessary, as by the petition filed by the appellee in the county court for partial distribution he had definitely set up that he was the husband of the decedent, Lucy Lotson Perry, and this was the issue tried in the county court, and before the district court on appeal.

While appellant devotes much space in his brief to the allegation that common-law marriages have been abrogated by statute, we shall not concern ourselves with his dissertation on that subject, for we feel if anything is settled in the law of this state, so far as the court is concerned, the method of entering into the marriage relation as known at common law is fully recognized. The court is through with that question. Should it meet with disturbance again, let it be at the hands of the legislative branch of the government. In re Love's Estate (1914), 42 Okla. 478, 142 Pac. 305; Palmer v. Culley et al., 52 Okla. 454, 153 Pac. 154; Draughn v. State, 12 Okla. Cr. 479, 158 Pac. 890; Sanders v. Sanders, 67 Okla. 3, 168 Pac. 197; Coleman v. James, 67 Okla. 112, 169 Pac. 1064; Thomas v. James, 69 Okla. 285, 171 Pac. 855; Smith et al. v. Blunt, 84 Okla. 225, 202 Pac. 1027; Dunlap v. Dunlap. 88 Okla. 200, 212 Pac. 608; Stuart, Guardian, v. Schoonover, 104 Okla. 28, 229 Pac. 812.

In the instant case, the decedent had secured a divorce from her former husband, Beaver, in the district court of Craig county on the 16th day of July, 1921. On the 21st day of October, 1921, after issuance of license in accordance with the law of the state of Missouri, a ceremonial marriage was entered into between appellee, Samuel A. Perry, and the decedent, Lucy Lotson Beaver.

If it be conceded that under the case of Atkeson v. Sovereign Lodge W. O. W., 90 Okla. 154, 216 Pac. 467, this marriage was without legal force, the contracting parties being residents and domiciled in the state of Oklahoma, the question under the record arises as to whether or not it was meretritious, and if so, whether or not the record disclosed that its meretritious character continued to the death of the deceased. (In last-named case there was a divided court.) To be meretritious, it must have been knowingly illicit. At the time of this marriage, the said Atkeson Case had not been rendered by this court, and even many members of the bar (and some members of this court) believed that under the law of this state, the inhibition against marriage contained in each decree until the expiration of six months was not one which continued the marital status, so as to render invalid a marriage contracted in a jurisdiction where it would otherwise be valid. This idea was quite general among the citizenship as disclosed by the Atkeson Case itself, and there is nothing in the record that even indicates that the intentions of the parties at the time of entering into this relation by the marriage ceremony, intended other than that their relation should be matrimonial and not meretritious. Immediately after the said ceremony, the decedent wrote her brother, appellant herein, and his wife, announcing her marriage, and advising them the date of her intended return to Oklahoma. That a feast or wedding supper was given on their return from Kansas City; that the appellee and the decedent stopped on their way back at the home of one Annie Slager, near Baxter Springs, Kan., and there made known their marriage to their friends. The fact of their marriage was carried in the Kansas City papers, the account of which was read by friends and relatives in Craig county, Okla.; that shortly after returning to Craig county, decedent went to the bank in Vinita, the county seat of said county, and advised of her marriage and requested that her bank account be changed from the name of Lucy Beaver to the name of Lucy Perry. That the appellee and the decedent visited among their friends and acquaintances, and on all occasions were received as

occupying the relation each to the other of husband and wife. When introductions were necessary, they were so introduced. About a month after their return from Kansas City, decedent and the appellee were invited to accompany a party of Quapaw Indians and their wives and children on a camping expedition to the Mexican border, and among the numerous people who took this trip there was nothing except an unquestioned recognition of the decedent and appellee as husband and wife, they occupying, to the knowledge of all, the same tent, and the relation of husband and wife in every sense. These matters go to their good faith intent in entering into the Kansas City ceremony. These people were Indians. The Quapaw agency of the federal government was located at Miami, Okla. Soon after their return, they made a trip to Miami, the appellee and the decedent going together, where the agent was advised by the decedent of her marriage to the appellee and requested that her name be changed on the Indian records from Lucy Lotson Beaver to Lucy Lotson Perry. Several visits were made up to March 11, 1922. About this last named date, her last visit was made to the agency at Miami, accompanied by her husband, and apparently on that date the first official action by the Indian agency was taken on her request, made in the presence of the appellee, that her business with the agency be transacted in her name as Lucy Lotson Perry, Samuel A. Perry, appellee, was continuously, not only to relatives and friends, but to all persons, whether laborers or otherwise, with whom they had transactions, presented as her husband. Later, she appeared at the Indian agency at Pawhuska, she being an Osage, and sometime shortly before the 21st of March, 1922, in company with her husband, Samuel A. Perry, appellee herein, and introduced him as her husband, and requested that the records of the Indian agency there be changed to show her name Lucy Lotson Perry instead of her former name, Lucy Lotson Beaver. And thereafter, at said Pawhuska agency, the matters touching her Indian property rights were transacted in her name as Lucy Lotson Perry. The record further discloses that she, being an Osage, and recognizing that her Osage people usually gave gifts in accentuation of the matrimonial obligations, on one occasion presented the appellee a team of horses, at the same time referring in her conversation, relative thereto, to the customary pledge among her tribal people, of continuous marriage relation and cohabitation, as long as both of the parties lived, and wistfully expressing that same should

ever be between herself and appellee.

The record further discloses that on one occasion, in the presence of Maude Lee Mudd, whose appeal herein has been dismissed, in discussing the fact that a marriage among white people was only necessary to be consummated once, apparently meaning that the Indians in a measure still look with sanctity upon their old tribal method of consummating marriage, and while feeling that they were called upon, under the new order of things, to follow the laws enacted under the control of their white neighbors, she remarked that a further solemnization in keeping with their tribal customs was not amiss. That the observance of such tribal custom was referred to in presenting the said team to her husband, with a declaration which apparently was understood to be in keeping with the formal marital assent between a man and woman among the Osages, that they expected to live together as man and wife till death. This was after her said disability ceased.

It is beyond controversy that after the marriage ceremony in Kansas City, and after the six months period from July 16th expired, and continuously, she bore the name of Lucy Lotson Perry on the records of the tribal agencies, on the bank records, and in the transaction of her business affairs; that she repeatedly made known the marriage; that they lived together after the six months period expired as man and wife; that when she became sick, in the spring of 1922, the appellee arranged to take her to Mayo's Hospital, in Minnesota, for an operation, but she refused to go. That she went along with him for treatment to an Indian doctor near Kellyville, in Creek county, and there discussed with her friends how kind appellee had been to her since their marriage; that she died, and was buried as Lucy Perry. The appellee, Samuel A. Perry, was recognized by Alex Mudd and Maude Lee Mudd as the husband of Lucy Perry up to the time of her death. Samuel A. Perry, appellee herein, as the surviving husband of Lucy, made affidavit necessary to have an administrator appointed of the estate of the decedent. Under this state of facts, did there exist a lawful marriage at the time of the death of Lucy?

In the nature of things, there can be no fixed standard by which the sufficiency of evidence of a common-law marriage can be governed. 18 R. C. L., page 426. At common law, marriage was recognized as being created per verba de praesenti. It was the mutual present consent from each to

the other that created the bonds of matrimony. Frequently, in discussing common-law marriages, the courts have injected confusion as to what was necessary to constitute the relation. The confusion has arisen, however, by not clearly distinguishing between what is to be established and the method of establishing it. In all matters of marriage at common law the question to be reached is whether or not there was a contract between the man and the woman to be husband and wife, not in the future, but in the present. In re Hulett's Estate (Minn.) 34 L. R. A. 384. In the absence of convincing evidence direct in its nature, as to such an agreement, and for the purpose of reaching the conclusion that such an agreement or meeting of minds actually existed between the parties, facts and circumstances might be introduced in evidence, such as the conduct of the parties, the manner each was held out by the other to the public, the relation they sustained to each other, etc., but this character of evidence is only for the purpose of giving rise to the implication that the contract of marriage actually existed between the parties.

Bishop in his work on Marriage and Divorce, in treating of marriages formally entered into in good faith, where there was an impediment to the marriage on the part of one of the parties at the time of the ceremony, says:

"If the parties desire marriage and do what they can to render their union matrimonial, though one of them is under a disability, their cohabitation thus matrimonially meant will in matter of law make them husband and wife, from the moment when the disability is removed." 1 Bish., Mar. & Div., secs. 970, 975, 979. Teter v. Teter, 101 Ind. 129; Poole v. People (Colo. Sup.) 52 Pac. 1025.

As said by the Supreme Court of Kansas, through Justice Johnson (60 Pac. 311), which has been followed in effect by this court, reiterating the doctrine theretofore laid down in the case of Renfrow v. Renfrow, 60 Kan. 277:

"An express agreement between the parties to take and live with each other as husband and wife is not necessary. The agreement to do so may be implied from their acts and conduct in mutually recognizing and holding each other out as bound together in the matrimonial state."

In the instant case, a marriage was formally entered into or celebrated. There is nothing in the record to even indicate that the deceased and the appellee entertained any other thought than that this formal ceremony created the relation of man and wife. Numerous expressions by word of mouth were had after the impediment of the decedent had terminated, showing conclusively the regard that each had to the other was that of husband and wife. In their business transactions and in their social relations, they were recognized as such. Under these conditions, as disclosed by the record, it cannot with any degree of reason be contended that at the time of Lucy Lotson Perry's death she was not the lawful wife of the appellee. This was the finding of the district court upon all the evidence. A marriage vel non, being in its nature an issue triable as an action at law, if there is evidence reasonably tending to support the conclusion reached, it cannot be disturbed by this court.

The judgment of the district court ordering the county court to distribute one-half the estate to the appellee as the husband of the decedent is affirmed.

NICHOLSON, C. J., and HARRISON, LESTER, CLARK, and RILEY, JJ., concur. MASON, PHELPS, and HUNT, JJ., dissent.

Note.—See under (1) 26 Cyc. pp. 838, 840. (2) 4 C. J. p. 943, sec. 2920. (3) 18 C. J. p. 875. (4) 28 Cyc. p. 884.

---

PHELPS, J. (dissenting). On July 16, 1921, upon her petition, Lucy Lotson Beaver was granted a decree of divorce from Alexander Lewis Beaver in the district court of Craig county, Okla., said divorce decree reciting, among other things, "that the parties hereto cannot marry another for six months from the date hereof; * * * that plaintiff be restored to her widowed name of Lucy Lotson."

On the 24th day of October, 1921, Lucy Lotson went, in company with Samuel A. Perry, to Kansas City, in the state of Missouri, and they there procured a marriage license and had a purported marriage ceremony performed by one John George, a justice of the peace; they returned to Craig county, Okla., the place of their residence for many years, and assumed the marital relation and continued to live together in Craig county, Okla., until the 31st day of May, 1922, when Lucy Lotson Perry died intestate, leaving both real and personal property. An administrator of her estate was duly appointed and qualified, and after notice to creditors had been given, and after the expiration of more than four months, on March 24, 1923, a petition was filed in the county court of Craig county by Alex Mudd and Maude Lee Mudd, praying the county court to order a partial distribution

of said estate to said petitioners, alleging in their petition that they were the surviving brother and daughter of a deceased brother of said Lucy Lotson Perry, and were the sole surviving heirs at law of decedent and entitled to have the estate of Lucy Lotson Perry distributed to them. Due notice of the hearing of said petition was given, and on April 19, 1923, Samuel A. Perry filed his answer and cross-petition admitting that Alex Mudd was a surviving brother of decedent and Maude Lee Mudd was a daughter of a deceased brother of decedent, both of whom he admitted were entitled to share in the distribution of the estate of decedent, but alleging that—

"On the 24th day of October, 1921, he was legally married to the said Lucy Lotson Perry; that he lived and cohabited with her from said time, as her lawful husband, down to the date of her death, which occurred on the 31st day of May, 1922; that she left no surviving children or child"

—and praying that upon hearing he be decreed by the county court the surviving lawful husband of said Lucy Lotson Perry and that one-half of her estate be distributed to him and that the remaining one-half be distributed equally to Alex Mudd and Maude Lee Mudd, the three of whom constituted the sole surviving heirs at law of decedent.

The petition of Alex Mudd and Maude Lee Mudd and the answer and cross-petition of Samuel A. Perry came on for hearing in its regular order, and after said hearing and on the 17th day of May, 1923, the county court of Craig county entered its order and finding that the said

"Alex Mudd and Maude Lee Mudd are the sole and only heirs at law of said decedent, and the sole and only persons entitled to have distributed to them the estate of said decedent; that cross-petitioner, Samuel A. Perry, is not an heir of said decedent and is not entitled to have distributed to him any portion of the estate of said decedent"

—and ordered that a partial distribution of said estate be made, from which finding and order of the county court Samuel A. Perry prosecuted his appeal to the district court of Craig county.

When the appeal was called for trial in the district court of Craig county, Samuel A. Perry, the appellant, over the objection and exception of the appellees, first having obtained permission of the court to do so, amended his answer and cross-petition by inserting the following paragraph:

"That the said Lucy Lotson Perry and Samuel A. Perry were married at Kansas City, state of Missouri, by ceremonial marriage on the 24th day of October, 1921, in good faith, for the purpose of lawful matrimony, and that they thereafter lived together as husband and wife, treating each other as such, holding themselves out to society, their friends, relatives and the world as such, and being so regarded by their friends, relatives, and the world; and that this relation continued down to the date of her death on the 31st day of May, 1922, they each believing themselves to be lawfully wedded and believing their relations lawful, and intending it to be so. That subsequent to said marriage ceremony at Kansas City said parties also accepted and agreed with each other that they were to live together as husband and wife according to the customs of the Osage Tribe of Indians."

After hearing the evidence in support of the petition and answer and cross-petition, the district court of Craig county, on the 1st day of March, 1924, rendered its judgment and order, finding that Samuel A. Perry was the lawful surviving husband of decedent and entitled to inherit one-half of the estate of decedent, and that Alex Mudd and Maude Lee Mudd were entitled to each inherit one-fourth ($\frac{1}{4}$) thereof, and from this order and judgment Alex Mudd and Maude Lee Mudd prosecute their appeal to this court. However, appellant Maude Lee Mudd has subsequently dismissed her appeal.

There are a number of assignments of error, but in our judgment there are two which are well taken, either one of which necessitates a reversal of the judgment of the district court. First, it is contended by plaintiff in error, and that contention is, in our judgment, abundantly justified by the facts disclosed by the record, that in the county court Samuel A. Perry based his claim to participate in the distribution of the estate of the decedent wholly and entirely upon the Kansas City marriage ceremony, which was performed about three months after the decedent was divorced in Craig county from her former husband, and at a time when she was legally incompetent to contract marriage. However, after the county court made its findings and before the case was tried in the district court, the Supreme Court of this state, in the case of Atkeson v. Sovereign Camp, W. O. W., 90 Okla. 154, 216 Pac. 467, rendered its opinion holding that—

"A marriage contract entered into between persons, one of whom has been divorced, within the six months' period, even though the marriage ceremony is performed outside of this state, is void."

It is contended by plaintiff in error that

after the rendition of this opinion by this court defendant in error sought to avoid the consequences of this opinion by changing the issues and amending his answer and cross-petition after the cause had been lodged in the district court, and that the district court committed reversible error in permitting said issues to be changed. We are of the opinion that the complaint of the plaintiff in error in this respect is well founded. In the case of Parker v. Lewis, 45 Okla. 807, 147 Pac. 310, this court says:

"While by section 16, art. 7, Constitution, it is provided that, on appeal to the district court in probate matters, the cause shall be tried de novo upon questions of both law and fact, we are not to understand that thereby new and distinct issues may be made for the first time. A trial de novo has a well-defined and generally understood meaning, and does not contemplate the framing of new issues in the appellate court. In Ex parte Morales (Tex. Cr. App.) 53 S. W. 107, it was said that a trial de novo on appeal requires that appeals be tried upon the original papers and upon the same issues as had below, and that the term 'de novo' meant 'anew,' 'a second time,' citing Rap. & L. Dictionary, 8 Am. & Eng. Enc. of Law 832. In this connection in 3 Cyc. 262, referring to appeals from probate courts, the rule is thus announced: 'The case is to be tried in the appellate court upon the same issues that were presented in the lower court.' "

This court again said in Re McGannon's Estate, 50 Okla. 288, 150 Pac. 1109, speaking on this subject:

"On such appeal, however, the issues must remain the same as those tried in the county court, as the jurisdiction of the district court is only appellate and no new issues can be injected into the case in the district court."

Also in Re Estate of Talomase, 98 Okla. 212, 225 Pac. 156, in the third paragraph of the syllabus this court said:

"The district court has no original jurisdiction of the settlement of guardianship accounts, but has appellate jurisdiction only, and where an appeal is taken to the district court from the orders of the county court in guardianship matters, new items of account offered in the district court by way of amendment to the report of the guardian can not be considered."

A careful investigation of the record forces us to the inevitable conclusion that when the defendant in error appeared in county court he staked his claim to participate in the distribution of the estate of decedent entirely upon the Kansas City ceremonial marriage, but after this court had rendered the opinion in the Aitkeson Case,

that he then saw the futility of attempting to stand upon this alleged marriage and sought cover under the protecting wing of a so-called common-law marriage, and in allowing him to change the very foundation of his action we think the district court committed reversible error.

However, the real question in our judgment presented by the facts in this case is whether or not the defendant in error should be entitled to a portion of the estate of the decedent upon his claim as the common-law husband of decedent. Indeed it appears from the record that his claim both in the district court and in this court is based entirely upon what he is pleased to term a common-law marriage after the expiration of the six months' period following the granting of the divorce to decedent.

Section 510, C. S. 1921, provides:

"It shall be unlawful in any event for either party to such suit to marry any other person within six months from the date of the decree of divorcement * * * any person marrying contrary to the provision of this section shall be deemed guilty of bigamy, and such marriage shall be absolutely void."

And section 511, C. S. 1921, further provides that:

"Every person convicted of bigamy, as such offense is defined in the foregoing section, shall be punished by imprisonment in the penitentiary for a term of not less than one year, nor more than three years."

Section 2432, C. O. S. 1921, provides:

"When the offense either of bigamy or incest is committed in one county and the defendant is apprehended in another, the jurisdiction is in either county."

Section 2720, C. O. S. 1921, further provides:

* * * And when the second marriage took place out of the state, proof of that fact accompanied with proof of cohabitation thereafter in this state is sufficient to sustain the charge."

The validity of this statute was first called in question in the case of Wilson v. State, 16 Okla. Cr. R. 471, 184 Pac. 603, wherein W. E. Wilson, within six months after a divorce decree had been granted, went to the state of Texas, married another woman, and returned to reside in Oklahoma; he was prosecuted under the above statute in the district court of Cotton county and found guilty and given a sentence of one year in the penitentiary, from which conviction he appealed to the Criminal Court of Appeals, and in passing upon that provision of the statute the court said:

.."The penal provisions of section 4971, R. L. 1910 (which is sec. 510, C. S. 1921), are directed solely against the remarriage of either party to a divorce proceeding to any other person within six months immediately subsequent to the rendition of the decree of divorce. Held, the jurisdiction of a prosecution under such statute is in the county where the second marriage takes place; and, held, further, where one of the parties to such decree, within the prohibited period of six months, marries another person without the state, and subsequently returns and cohabits with such person in this state, the subsequent cohabitation not being of the gist of the offense defined by such statute, there is no jurisdiction to prosecute thereunder in- this state."

This decision seems to have been considered an invitation for those who had a desire to violate this provision of the law to make a mad rush to adjoining states for the purpose of attempting to evade the provisions of the statutes above quoted. Counsel for defendant in error in his opening statement to the court (C.-M. 72) says:

"It was the common practice in this state * * * there are thousands of marriages in this state consummated on the assumption that they had a right to go to another state and marry. * * * A well-known judge who sat on the bench in Tulsa county for a good many years made the statement that there were at least four hundred of these cases in Tulsa county alone."

It will be observed that the Criminal Court of Appeals in the case of Wilson v. State, supra, did not even hint that such a marriage is a valid marriage, but merely held that a prosecution would not lie in this state where the marriage was consummated in another state, although the impediment existed. We are fully aware that there are a great number of decisions of this court recognizing a so-called common-law marriage, but we submit that this court has never recognized as a valid marriage one consummated and continued under the conditions disclosed by the record in the case at bar.

Under the doctrine laid down in Atkeson v Sovereign Camp W. O. W., supra, the marriage of Lucy Lotson and Samuel A. Perry was void ab initio. It was not only void, but under the terms of our statute bigamous and felonious, and from the record and briefs we assume that counsel for defendant in error base no claim for their client upon such void marriage, but claim a right to participate in the distribution of Lucy's estate entirely upon what they are pleased to term a common-law marriage, which position, in our judgment, is wholly untenable. They cite with approval and

quote at length the case of Stuart v. Schoonover, 104 Okla. 28, 229 Pac. 812, but a careful examination of that authority is a very convincing argument against the position of defendant in error. In that case Mary Crowther Schoonover obtained a divorce from her husband, Eugene Crowther, on August 7, 1916; about 28 days before the expiration of the six months period she and Grover C. Schoonover went from Osage county, Okla., to Muskogee, Okla., procured a marriage license, and celebrated ceremonious nuptials; they went back to Osage county, where they lived as husband and wife, and commenting upon the facts, this court said:

"The pretended marriage of said Grover and Mary at Muskogee within six months of the date of her decree of divorce was absolutely void under the express language of our statute and the decisions of this court. If said Grover was the lawful husband of Mary at the time of her death, and thereby one of her heirs, he became such because of a common-law marriage, recognized in this state, consummated between them after such impediment was removed.

"Under Clark et al. v. Barney et al., 24 Okla. 455, 103 Pac. 598, if both Grover and Mary knew that they were contracting marriage before the expiration of said six months and that the former spouse of said Mary, Mr. Crowther, was still living, their relations in that event being bigamous and criminal ab initio, the presumption is that they continued so, and that this relation could not ripen into a common-law marriage, except by proof that by their acts and conduct, or agreement, after such impediment was removed, such relation became matrimonial rather than meretricious. * * * The judgment of the trial court is affirmed on the ground that, whether they were in good faith or bad faith in the beginning—whether their relations ab initio were matrimonial or meretricious—they did consummate a common-law marriage after the removal of such impediment by their acts and conduct as well as by more formal agreement. * * *

"In September, 1917, domestic perturbations caused them to separate for a few days. Mr. Schoonover convinced Mary that he had not been unduly friendly with other women. They agreed to cease quarreling. She said she would live with him and be a good wife and he told her 'all right.' Thereupon they resumed the marital relations."

It will, therefore, be observed that the bigamous relations existing between the parties were terminated and were not considered by the court in determining whether or not they were really husband and wife, but their marital status was fixed by the

court entirely upon their agreement to live together as husband and wife after the removal of the impediment, to wit, the expiration of the six months period.

In the case of Clark et al. v. Barney et al., 24 Okla. 455, 103 Pac. 598, we quote the following:

"In this case it appears from paragraph 11 of the agreed facts that, when the alleged second marriage took place at Oklahoma City, the said Margaret Barney was then living at Topeka, Kan., undivorced from the said Joseph A. Barney, and that he and the said Elizabeth A. Barney knew that she was so living at Topeka, Kan. Under said admission the parties knew that they had not the capacity to consummate a marriage contract, and when they assumed such relation they knew it was unlawful and adulterous; nothing being bona fide. And while it is the policy of the law to encourage legitimacy, yet, in order to do so, it will not encourage licentiousness. This relation in its inception being bigamous and adulterous, after the death of the said Margaret Barney there is no presumption of a change of relation, and if there was such a change it must expressly appear by proof, to place the parties in the eyes of the law in a lawful relation. Common-law marriage grows out of good faith, honest intentions, and proper purposes, and if willful bigamous relations, after the death of the party who has been wronged by the other spouse, are to ripen per se by the continuance of such cohabitation, without any perceptible change in the manner of such relations, into a common-law marriage in order to put the seal of legitimacy upon such cohabitation, it would te d to put a premium upon the disregard of marital relations, rather than the ukase of the law against it. The judgment of the lower court is affirmed."

Therefore, before this court can find that Samuel A. Perry was the lawful husband and consequently an heir at law of Lucy Lotson Perry, the evidence must show that after the expiration of the six months period the bigamous relations were terminated and that the agreement, acts, and conduct of the parties were such as to constitute a common-law marriage under the doctrine, rules, and regulations laid down by this court, and that without regard to the purported Kansas City ceremony, and in this connection we submit that the record fails to disclose any facts other than the mere continuation of the bigamous relations existing between these parties upon which to predicate a finding that they in good faith, after the expiration of such six months, agreed to become husband and wife. The record is replete with evidence indicating a moral depravity on the part of the defendant in error, and brazenly testified to by himself, and discloses his total disregard of good morals or common decency; he admitted while upon the witness stand that on numerous occasions he had gone to hotels in Tulsa and elsewhere, and there registered under various assumed names with other women. The record also discloses that he had paid $500 in a bastardy proceeding, and was the defendant in a breach of promise suit, and that prior to his purported marriage to Lucy he had occupied the same bed with her, all of which has little bearing upon the real issues in this case, except in so far as it may shed some light upon his intentions and gives us a general insight into his character and mode of living.

Since the claim of defendant in error must rest upon the evidence of the marriage according to the Osage Indian custom, or the agreement between the parties after the removal of the disability, we deem it necessary to set out in full herein his testimony upon that subject, which is as follows:

"Q. Sam, state to the court if there was any occasion when Lucy spoke to you about a team of horses.

"A. Well, she told me she would give me a team, and she said, 'I will give you them team for you to work'—and Potter was driving the horses. And Potter came up and asked me what team he would take, and I told him any of them. So he drives up to the house, and my wife told me she didn't want Red to drive them; she wanted me to drive them. She said: 'I gave you them horses for you to drive and work them,' and she said, 'If you don't want to work them, just let them run out.'"

"Q. Now, was there any other occasion when she spoke about giving you some horses?

"A. Well, whenever we was going some place — I believe we was going to Slagle's —around through there some place; and Red was putting chains on the car; and we was out there and she came out and she said that 'the reason I gave you that team, I want to live with you as long as I live.' She said, 'I want you to live with me as man and wife as long as you live.' I said, 'All right, we will live together as long as we live—together as man and wife.'

"Q. Did she say she wanted you to live with her as man and wife as long as you lived?

"A. As long as she lived.

"Q. As long as she lived?

"A. And as long as I live.

"Q. She said that was the reason she gave you that team of horses?

"A. Yes, sir.

"Q. Well, did she ask you whether you would?

"A. She said, 'Won't you?' and I said 'Yes, I will live with you as long as you live.' * * *

"Q. Well, do you remember, while you were all at the supper table, of a conversation with Lucy about the Osage way of marrying?

"A. Well, she told them that—at the table—she was talking to this old lady, this grandmother of the niece; she was talking to her; she said that the old custom—that the old Osage Tribe—that when they got married they gave one another stuff. That is what she said.

"Q. Did she say anything to you at that time?

"A. Well, she didn't say. She was talking there to the folks, there, and I was there.

"Q. Did she say anything about the horses she had given you, at that time?

"A. Well, she said, 'I gave Sam this team of horses,' and she said, 'We are going to live together as man and wife as long as we live.' * * *

"Q. Sam, you testified on yesterday respecting two conversations that were held with Lucy. One out at the automobile and one at the supper table. You remember the circumstances do you of those two talks?

"A. Yes, sir.

"Q. Now, when Lucy said to you at that time that she wanted you to live with her as man and wife as long as you lived and you answered that you would?

"A. Yes, sir.

"Q. That was because you thought you were already man and wife under the Kansas City marriage, didn't you?

"A. Well, she told me that we would live as man and wife as long as we lived. I just said 'all right.'

"Q. Well, answer my question; that was because you thought you had already been married under the Kansas City marriage wasn't it, that you were already man and wife?

"A. I know we was married in Kansas City.

"Q. And that is the reason you said— that wasn't the reason you said all right?

"A. Well, I don't know any difference, only I told her 'all right; I would live with her all right after she had told me that.

"Q. Because you had been married in Kansas City.

"A. Well, that is the only marriage I know, yes.

"Q. Well, that is the reason you said that, wasn't it?

"A. I told her that I would live with her when she told me that.

"Q. Well, that is the reason you told her that, because you had been married in Kansas City?

"A. The reason I told her that was because she said we will live as man and wife all our lives.

"Q. Because you had been married in Kansas City.

"A. No sir, because she told me that at that place.

"Q. You knew at that time that you had been married in Kansas City.

"A. Yes, I knew it.

"Q. And you thought that marriage was a valid marriage at that time.

"A. Well, I said that, of course.

"Q. Answer my question.

"A. Yes, I know we had been married in Kansas City.

"Q. You thought at that time that it was a valid marriage.

"A. Well, I said because she asked me that."

The case of defendant in error can be no stronger than his own testimony makes it, and based upon the above testimony we cannot in good conscience find that a so-called common-law marriage existed between these people. It appears that Lucy was only a half-blood Osage, and that Samuel was enrolled as a Cherokee, and it also appears from the record that they were not living in the Osage Nation any of the time testified about. It also appears that these people, although Indians, were people of intelligence and not of the ignorant "blanket" variety. Neither does it appear that, although Lucy had been married twice before, she ever had indulged in any of the luxuries of a marriage ceremony according to the custom of the Osages.

We are, therefore, driven to the conclusion that these people went to the state of Missouri and consummated this bigamous marriage for the sole and only purpose of evading the consequences of the penal statutes of this state. In this enlightened age we see no good reason and but little excuse to encourage the so-called common-law marriage. If these people had in good faith desired to live together as husband and wife after the removal of the disability, there was nothing to prevent them from procuring a marriage license and being united in mar-

riage according to the methods prescribed by the laws of the state, failing in which, according to the decisions of this court heretofore rendered, the bigamous relations continued down to the date of the death of decedent. It is not our desire to disturb the previous opinions of this court recognizing so-called common-law marriages, but this court has not heretofore held that a mere continuation of a bigamous relation after the removal of the disability ripens into the sacred relation of husband and wife. We conceive it to be the duty of the courts to interpret and administer the laws of the state as they find them, and while some courts of other jurisdictions have gone far enough to declare the mere continuation of a bigamous marriage, after the removal of the disability, to be a common-law marriage, we are of the opinion that such reasoning is calculated to encourage licentiousness and furnish an excuse for every libertine who may desire to satiate his lustful thirst in an adulterous relation, for saying, when confronted with the consequences of his act, that his status constitutes a common-law marriage, and thus evade the penalty of the law. All good citizens will agree that the very foundation stone of the American republic is the happy American home. The home can perform its full mission and develop into full fruition only when existing according to, by virtue of, and under the provisions of the laws of the commonwealth governing the sacred relation of husband and wife. To say that a marriage conceived in bigamy, brought forth in adultery, and continued feloniously by its mere continuation ripens into the sacred and holy relation of husband and wife, the most sacred relation known to human beings, is going further than, the writer of this opinion is willing to go. We therefore think the judgment of the district court of Craig county should be reversed and the case remanded. with instructions to render judgment in conformity to the views herein expressed.

MASON and HUNT, JJ., concur.

Note.—See under (1) 4 C. J. p. 728.