Lucinda Cully, hereinafter referred to as plaintiff, filed a petition in the county court of Seminole county to determine the heirs of Wallace Cully, deceased. She alleged that she was the wife of Wallace Cully on January 8, 1937, the date of his death. She alleged that there was one child born to the marriage, which child died without issue, and that Wallace Cully left no other children, and that the only heirs were plaintiff and the brothers and sisters of deceased, and the children of deceased brothers and sisters. All of *Page 420 
these parties were made parties defendant to the action.
A hearing was had before the county court which resulted in a finding that plaintiff was the wife of deceased on the date of his death and was entitled to a wife's share of his estate. An appeal was prosecuted to the district court, where another hearing was had, and the judgment of the county court affirmed, except in certain particulars not necessary to mention here. A number of the heirs have prosecuted an appeal to this court.
It is conceded that there is but a single issue presented here for determination, and that is whether or not the trial court erred in finding that plaintiff was the wife of Wallace Cully on the date of his death.
All of the parties to this action are Seminole Indians. Plaintiff testified that she had lived with the deceased, Wallace Cully, as his wife, since the year 1925 to the date of his death in 1937. Plaintiff testified further that her first husband was Jim Taylor; that to their marriage was born one child; that the child died in infancy; that she was separated or divorced from Jim Taylor according to the Indian custom; that Jim Taylor thereafter had several wives; that she thereafter married Thompson Davis; that to this marriage was born four children and only one of them is now living. It appears that Thompson Davis served a term in the penitentiary, which term was completed in 1914. Plaintiff testified that he did not return to her after he left the penitentiary, but married another woman. Plaintiff further testified that Thompson Davis thereafter had several other wives; and that he died in 1927. On cross-examination her testimony indicates that she believed that his conviction and sentence to the penitentiary terminated the marriage relation. She testified further that she had a child by one John Harjo. No contention is made of any marriage relation with Harjo, since he was a married man at that time. She testified that she had sexual relations with Wallace Cully in 1924; that a child was born to them in 1925; that when the child was born she was living in her own home, and about a month later moved into the home of Wallace Cully, pursuant to their agreement to live together; that they continued to live together until the date of his death; that he always referred to her as "the old lady," which in Indian language means "my wife."
Defendants introduced certain files from the probate proceeding in the case of the probate of the estate of Thompson Davis. According to this documentary evidence the plaintiff, Lucinda Cully, therein represented herself as an heir of Thompson Davis.
Defendants contend that the purported marriage between plaintiff and Wallace Cully was contracted at a time when she had a living undivorced spouse and that the same was bigamous and criminal in its inception and could not ripen into a common-law marriage; whereas plaintiff contends that her marriage with Wallace Cully was contracted in good faith, and even though said marriage was bigamous in its inception, after the death of Thompson Davis in 1927, she and Wallace Cully continued to live together until his death in 1937; that their relationship was matrimonial and that their marriage became fully consummated as a common-law marriage and existed to the date of his death.
The defendants rely in the main upon the case of Clark v. Barney, 24 Okla. 455, 103 P. 598. The question there presented was whether or not Elizabeth A. Barney was the lawful wife of Joseph A. Barney at the time of his death. It is shown that these parties were married in 1880 and divorced in 1884; that Joseph A. Barney married Mrs. Margaret Fensky February 5, 1885, and on August 22, 1894, Joseph A. Barney and Mrs. Elizabeth A. Barney were remarried at Oklahoma City, at which time both parties knew that Margaret Barney, formerly Fensky, was living and undivorced from Joseph A. Barney. Margaret Barney, formerly Fensky, died on October 14, 1894, and Joseph A. Barney and Mrs. Elizabeth A. Barney lived together from that date until the death of Joseph A. Barney on October 15, 1900. The court *Page 421 
held that since both parties knew at the time of their purported marriage that there was a living, undivorced spouse of Joseph A. Barney, such relationship was entered into in bad faith, and after the death of Margaret Barney there was no presumption of a change of relation, and if there was such a change, it must be expressly proved in order to "place the parties in the eyes of the law in a lawful relation."
Defendants also refer to the case of Brokeshoulder v. Brokeshoulder, 84 Okla. 249, 204 P. 284. That case involved a contest between two women in a probate proceeding, each claiming to be the lawful wife of the deceased. The sole question was whether or not the first marriage of deceased had been dissolved by divorce, thus making a second marriage legal. The issues in that case are in no wise similar to the issues herein involved.
Plaintiff relies upon the case of Webster v. Webster,114 Okla. 57, 242 P. 555. In that case the question presented was whether or not Eliza Webster was the lawful wife of Edward Webster. These parties were full-blood Creek Indians. It appeared that Eliza Webster was married in 1890 to one Tom Canard, and that they separated in 1906. In 1907 she married Edward Webster and they lived together continuously until 1915 and at intervals until 1917. Tom Canard died in 1911. With regard to the validity of the marriage between Eliza Webster and Edward Webster the court said:
". . . It is a doctrine of ancient origin that the law presumes that a relation, connubial in its nature, is matrimonial, and not meretricious. This presumption does not extend to the point of undertaking to protect an illicit cohabitation, or to create in one of the parties who attempts to contract marriage a capability of entering into such contract when the same does not exist, but it does extend to the point that where a marriage is entered into according to the forms of law, and one of the parties is laboring under a disability, or is incapable by reason of a living spouse from whom she has not been divorced, from legally contracting marriage, that if this disability ceases, by death or otherwise, the contracting parties continuing to live together ostensibly in the marriage relation, the law stamps such relation as a marriage from the first moment the disability on the part of one of the parties ceases. That is to say, the law raises the conclusive presumption, under such condition, that they had interchanged, each with the other, that personal consent which is the basis of a legal marriage. . . .
"Appellants seem to contend that the exchange of matrimonial consent between these parties must be referred solely to the hour of the ceremonial marriage, but in making this contention they overlook the universally recognized wholesome doctrine, where the so-called common-law marriage exists, that the law will infer consent to have been given at the earliest moment the law finds each of the parties capable of interchanging such consent. . . ."
In the case of Mudd v. Perry, 108 Okla. 168, 235 P. 479, it was said:
"Bishop, in his work on Marriage and Divorce, in treating of marriages formally entered into in good faith, where there was an impediment to the marriage on the part of one of the parties at the time of the ceremony, says:
" 'If the parties desire marriage, and do what they can to render their union matrimonial, though one of them is under a disability, their cohabitation thus matrimonially meant will in matter of law make them husband and wife, from the moment when the disability is removed.' 1 Bish., Mar. Div., secs. 970, 975, 979; Teter v. Teter, 101 Ind. 129, 51 Am. Rep. 742; Poole v. People, 24 Colo. 510, 52 P. 1025, 65 Am. St. Rep. 245.
"As said by the Supreme Court of Kansas, through Justice Johnson (Schuchart v. Schuchart, 61 Kan. 597, 60 P. 311, 50 L. R. A. 180, 78 Am. St. Rep. 342), which has been followed in effect by this court, reiterating the doctrine theretofore laid down in the case of Renfrow v. Renfrow, 60 Kan. 277, 56 P. 534, 72 Am. St. Rep. 350:
" 'An express agreement between the parties to take and live with each other as husband and wife is not necessary. The agreement to do so may be implied *Page 422 
from their acts and conduct in mutually recognizing and holding each other out as bound together in the matrimonial state.'
"In the instant case, a marriage was formally entered into or celebrated. There is nothing in the record to even indicate that the deceased and the appellee entertained any other thought than that this formal ceremony created the relation of man and wife. Numerous expressions by word of mouth were had after the impediment of the decedent had terminated, showing conclusively the regard that each had to the other was that of husband and wife. In their business transactions and in their social relations, they were recognized as such. Under these conditions, as disclosed by the record, it cannot with any degree of reason be contended that, at the time of Lucy Lotson Perry's death, she was not the lawful wife of the appellee. This was the finding of the district court upon all the evidence. A marriage vel non being in its nature an issue triable as an action at law, if there is evidence reasonably tending to support the conclusion reached, it cannot be disturbed by this court."
To the same effect, see the cases of Stuart v. Schoonover,104 Okla. 28, 229 P. 812; Mantz v. Gill, 147 Okla. 199,296 P. 441; In re Dearborn's Estate, 151 Okla. 58, 2 P.2d 93.
A great number of witnesses testified. From the evidence adduced it seems clear that Lucinda Cully and Wallace Cully considered themselves to be husband and wife and held themselves out to be such before the public in the communities in which they resided. Certain merchants were called as witnesses and testified that Wallace Cully had told them that Lucinda was his wife, and they were to let her have whatever merchandise she needed and that he would pay the bills.
Defendants contend that the relationship between Lucinda Cully and Wallace Cully had its inception in bad faith; that the purpose of their entering into the purported marriage relationship was to conceal their prior misconduct which was evidenced by the birth of a child. It appears, however, that the child died in 1926 and that the parties continued to live together for approximately 11 years thereafter. The continuance of such relation in good faith by these parties over such period of time, in effect, would tend to negative the assumption that the relationship began in bad faith and for improper purposes. Approximately ten years had expired since the death of Thompson Davis. The evidence justifies the finding by the trial court that all during this period of time the parties conducted themselves as husband and wife and were so considered by their associates and those with whom they transacted business. The conclusion of the trial court is amply sustained by the evidence.
The judgment is affirmed.
CORN, V. C. J., and RILEY, GIBSON, HURST, DAVISON, and ARNOLD, JJ., concur. WELCH, C. J., and BAYLESS, J., absent.