### In re NOEL'S HEIRSHIP.

No. 20452. Opinion Filed April 5, 1932.

R. L. Disney, for petitioners.

Wilkinson & Hudson, I. P. Keith, and D. D. Brunson, for respondents.

ANDREWS, J. This is an appeal from a judgment of the district court of Pittsburg county rendered in a proceeding for the determination of the heirship of Rena Noel, deceased, on a trial de novo on an appeal from the county court of Pittsburg county.

Rena Noel was a Choctaw Indian allottee. She was the illegitimate child of Georgia Ann Noel and she had not been acknowledged or adopted by her father. She died intestate in 1918, without lawful issue, leaving no brothers or sisters of whole or half blood, no husband, no mother, no grandfather or grandmother, and no uncles or aunts. Her mother had died in 1912 and the others had died prior to the death of the allottee.

It was agreed by the parties hereto that, under the provisions of section 11304, C. O. S. 1921, the allotment of Rena Noel descended to the heirs of her mother. Her mother was Georgia Ann Noel.

The issue in the case was: Who were the next of kin of Georgia Ann Noel, under the provisions of section 11301, C. O. S. 1921, which is the applicable statute? Bates v. Huddleston, 146 Okla. 259, 293 P. 1047.

The mother of Georgia Ann Noel was Lucy Noel, who thereafter married Wilson Frazier, and who for convenience hereinafter will be referred to as Lucy Frazier. Her name prior to the time that she married Johnson Noel was a collateral issue in the case.

It was agreed that at the death of Rena Noel, Johnson Noel's family was represented by Emaline Adams, the daughter of a sister of Johnson Noel, and Jennie Kemp, the daughter of a brother of Johnson Noel. Since the institution of the proceeding, Jennie Kemp died, leaving surviving her as her heirs a son, Mullen Kemp, and a husband, Stanton Kemp.

Emaline Adams, Mullen Kemp, and Stanton Kemp hereinafter will be referred to as the respondents. The purchasers of the land, who also appeared herein as respondents, hereinafter will be referred to as the purchasers of the land. Willis Watson,

Richardson Watson and Elizabeth Ludlow, when hereinafter referred to collectively, will be referred to as the petitioners.

· Under the agreement made, there was left for determination only the question of who, if anyone, constituted the next of kin of Georgia Ann Noel through Lucy Frazier, her mother.

It was contended by the petitioners that Willis Watson, Richardson Watson, and Elizabeth Ludlow were the surviving relatives and next of kin of Georgia Ann Noel through her mother, Lucy Fraizer. The record shows that Willis Watson and Richardson Watson were the sons of Robinson Watson, and that Elizabeth Ludlow was the daughter of James Jones.

The petitioners contend that Robinson Watson and James Jones were half-brothers of Lucy Frazier through a common mother, Alehama. If that is so, the petitioners are in equal degree of kin to Georgia Ann Noel with the respondents through ancestors in equal degree removed from Georgia Ann Noel. Bates v. Huddleston, supra. That contention is denied by the respondents, who contend that Robinson Watson and James Jones were not half-brothers of Lucy Frazier through a common mother, Alehama, and that the mother of Lucy Frazier was a sister of Alehama. If that is so, the petitioners claim through an ancestor of Georgia Ann Noel more remote than the ancestor through whom the respondents claim, and, under the provisions of section 11301, supra, as construed in Bates v. Huddleston, supra, the respondents are the next of kin of Georgia Ann Noel to the exclusion of the petitioners.

Thus it will be seen that this court must determine whether or not the judgment of the district court of Pittsburg county holding that Alehama was not the mother of Lucy Frazier is against the clear weight of the evidence. Griffith v. Scott, 128 Okla. 125, 261 P. 371; Moorman v. Pettit. 119 Okla. 22, 248 P. 838; Mattox v. Mattox, 129 Okla. 301, 264 P. 898. For that purpose the evidence will be reviewed, but a jurisdictional question will be determined first. The facts with reference thereto will be set out.

An application on behalf of the respondents to determine the heirship of Rena Noel was filed in the county court of Pittsburg county on the 30th day of August, 1919. It was therein alleged that the respondents were the sole and only heirs at law and next of kin of Rena Noel. Service by publication was therein made which ran to "all persons claiming heirship, ownership or interest in the estate of Rena Noel, deceased." There was no personal service upon any of the petitioners herein and none of them appeared therein. Wilson Frazier appeared therein and claimed to be the father of Rena Noel and that he had acknowledged her as his child. The cause was heard by that court on the 19th day of January, 1920, and on that date that court found against the contention of Wilson Frazier and for the respondents and that they were the next of kin of Rena Noel. Wilson Frazier appealed from the order to the district court of Pittsburg county. The cause was tried therein de novo on the 15th day of April, 1920. The district court denied the claim of Wilson Frazier and found that the respondents were the next of kin of Rena Noel. On September 1, 1920, Willis Watson and Richardson Watson, by the United States Probate Attorney as their attorney, filed in the county court a petition to vacate the decree of that court of January 19, 1920. On September 21, 1920, an amended petition therefor was filed by them through the same attorney. Nothing further seems to have been done until after the 12th day of October, 1925, when, at the instance of R. L. Disney, as attorney for Willis Watson and Richardson Watson, the county court set the amended petition for hearing on November 12, 1925. The record shows nothing done thereafter until March 20, 1926, on which date Elizabeth Ludlow filed her petition in the county court to vacate the decree of that court of January 19, 1920. On April 29, 1926, the county court rendered a judgment, from which an appeal was taken to the district court of Pittsburg county. That court on trial de novo, on January 19, 1928, rendered a judgment in favor of the respondents and the purchasers of the land and against the petitioners. From that judgment the petitioners appealed to this court.

The respondents contend that, inasmuch as there was no appeal from the judgment of the county court of January 19, 1920, by anyone other than Wilson Frazier, that judgment became final on the 19th day of January, 1920, as to everyone except Wilson Frazier, and that, at the expiration of six months therefrom, under the provisions of the Act of Congress of June 14, 1918, chapter 101, 40 Stat. 606 (U. S. Comp. Stat. 1918, sections 4234a, 4234b) the rights of the petitioners, if any they had prior to that time, were barred.

The petitioners contend that they were authorized by the statute cited to appear and

move to vacate the decree at any time within six months from the date of the final order; that, inasmuch as Wilson Frazier had appealed the cause to the district court where, under our statute (section 1424, C. O. S. 1921), it was required to be tried de novo, there was no final order as to the heirship prior to the 15th of April, 1920; that when Willis Watson and Richardson Watson, on September 1, 1920, filed their petition in the county court to vacate the decree of January 19, 1920, the question of the heirship was thereby opened, and that, when Elizabeth Ludlow filed her petition on the 20th day of March, 1926, no final order had been made in the cause.

The respondents cite, in support of their contention that the six months period provided by the statute runs from the date of the decree from which no appeal was taken, In re Fulsom's Estate, 141 Okla. 300, 285 P. 13, and Mudd v. Perry, 108 Okla. 168, 235 P. 479. The Fulsom Case quotes the relevant part of the federal statute. In that case it was held that the provisions of the federal act control over the provisions of the state statute, but there is nothing therein determining when the order determining the heirship shall become final. Mudd v. Perry, supra, held that a decree of heirship, under the federal statute, was conclusive against the world. There was nothing therein as to when a decree of heirship becomes final. We know of no statute or decision determining when a decree of heirship becomes final and that question must be determined herein for the first time.

The trial court was of the opinion that the judgment of the county court of January 19, 1920, appealed from by Wilson Frazier, who claimed to be the sole and only heir, did not become final until that appeal was decided. We think that the trial court was correct in that conclusion.

Under the provisions of the federal act, the question for determination by the county court in a proceeding brought thereunder is:

"Who are 'the heirs of any deceased citizen allottee of the Five Civilized Tribes of Indians who may die or may have heretofore died, leaving restricted heirs?'"

The proceeding is required to be conducted in the manner provided by the laws of the state for determination of heirship in closing up the estates of deceased persons. The order of the county court is made conclusive of the question, "Provided, that an appeal may be taken in the manner and to the court provided by law, in cases of appeal in probate matters generally." It is therein provided that service by publication may be had on all unknown heirs, the service to be in accordance with the method of serving nonresident defendants in civil suits in the district courts of the state.

In our opinion, when the order of the county court of Pittsburg county of January 19, 1920, determining the heirs of Rena Noel, was appealed from by Wilson Frazier, who claimed to be the sole and only heir at law, the question of who were the heirs of Rena Noel was submitted to the district court of Pittsburg county for its determination after a trial de novo. The question there submitted was not whether Wilson Frazier was an heir, but was, "Who are the heirs of Rena Noel, deceased?" A district court may determine the heirs to be those that were determined to be the heirs by the county court, or it may determine them to be different from that determined by the county court. If a district court determines the heirs to be the same as determined by the county court, the one who appealed from the order of the county court to the district court may appeal from the order of the district court to the Supreme Court. If a district court determines the heirs to be different from that determined by the county court, one who did not appeal from the order of the county court to the district court may appeal from the order of the district court to the Supreme Court. A final order, as used in the statute, refers to an order that is final by reason of no appeal having been taken therefrom and by reason of the expiration of the time for taking an appeal therefrom. Until the expiration of the time for taking an appeal from an order determining heirship, an order determining heirship is not a final order within the meaning of the statute. If an appeal is taken from an order of the county court determining heirship to the district court, the order of the county court is not a final order within the meaning of the statute.

Section 1414, C. O. S. 1921, provides when an appeal from an order of the county court to the district court shall be taken. Thereunder an appeal is authorized to be taken from a judgment, decree, or order, "or some specific part thereof." Take v. Woodruff, District Judge, 150 Okla. 73, 300 P. 698. But an order of the county court determining the heirship of an allottee, when appealed from by one who claims to be the sole and only heir at law, as in the case at bar, must be from the

judgment, decree or order of the county court determining the heirship, and cannot be from some specific part thereof. Under the provisions of section 1424, C. O. S. 1921, the trial in the district court "must be de novo, and shall be conducted in the same manner as if the case and proceedings had lawfully originated in that court." Under the provisions of section 1428, C. O. S. 1921, a district court must direct the proceedings to be remitted to the county court or the judge thereof that the county court may enforce the same in like manner as if no appeal therefrom had been taken. Until such an order has been made by the district court to which an appeal was taken from the order of the county court, the order of the county court is not a final order within the meaning of the federal act.

If the theory of the respondents is correct, a person served by publication in a proceeding in a county court for the determination of heirship must appear in the county court and move to be heard therein within six months from the date of the order of the county court or be concluded by that order, though the determination of heirship proceeding has been appealed to the district court and is pending there for trial de novo in that court. Certainly the county court could not proceed to hear the claim of such a person to be an heir and determine the same, for the determination thereof might destroy the effect of the determination theretofore made by the county court from which an appeal had been taken to the district court. If such an order should be made by the county court and an appeal was taken therefrom to the district court, there would then be pending in the district court an appeal from two orders of the county court, one determining the heirship to be one way, and another determining the heirship to be another way. On the trial de novo of those separate appeals in the district court, the district court in each case might determine the heirship as determined by the county court, which would result in the determination of two groups of people to be the sole and only heirs at law.

We therefore hold that, under the provisions of the act of Congress in question, the final order therein referred to is an order of a county court having jurisdiction, determining the heirship of a deceased allottee of the Five Civilized Tribes of Indians, who died leaving restricted heirs, from which no appeal was taken to the district court, the time for taking such an appeal having expired, or an order of the district court made

on appeal from an order of such county court which has become final, and that a person served by publication may appear in the county court and move to be heard in the determination of heirship proceedings at any time within six months from the date of the final order. Since Willis Watson and Robinson Watson filed their petition in the county court of Pittsburg county to vacate the decree of the county court of Pittsburg county of January 19, 1920, within six months from the date of the order of the district court of Pittsburg county made after a trial de novo on appeal from the order of the county court of Pittsburg county in the proceedings, they were not concluded by the order of the county court of Pittsburg county determining the heirship of Rena Noel. The district court of Pittsburg county did not err in refusing to dismiss the claim of Willis Watson and Robinson Watson and in hearing the evidence and determining the issue presented.

Elizabeth Ludlow did not file her petition to vacate the order of the county court of Pittsburg county and did not appear in that court and move to be heard in the matter of the determination of the heirship of Rena Noel within six months from the date of the final order. She was concluded by the order of the county court of Pittsburg county. The district court of Pittsburg county erred in refusing to dismiss the proceedings as to her. Her right to be adjudged to be an heir of Rena Noel was lost by her failure to assert her right within the time authorized by Congress for the assertion thereof.

It is shown by the record that the respondents sold their interest in the allotment of Rena Noel, with the approval of the county court of Pittsburg county, on July 12, 1920, after the judgment of the district court of Pittsburg county was rendered on the 19th day of January, 1920, and prior to September 1, 1920, the date of the filing of the petition by Willis Watson and Richardson Watson to vacate the decree.

The purchasers contend that, by reason of their having relied upon the decree of the district court of Pittsburg county in making the purchase of the land, they are protected in their title against any claim thereafter filed. We think that that contention is without merit. The act of Congress, under which the proceeding was brought, authorizes service by publication. It provides that if any person served by publication does not appear and move to be heard within six months from the date of the final order, "he shall be concluded equally with parties personal-

ly served or voluntarily appearing." The language shows that he shall be precluded only if he does not appear and move to be heard within six months from the date of the final order. His right to appear and move to be heard within six months from the date of the final order may not be defeated by a sale of the property within that six months period. The congressional act is mandatory and controlling. In re Fulsom's Estate, supra. The provisions of section 256, C. O. S. 1921, have no application and Congress has not seen fit to adopt any such provisions.

Rufus Winlock testified on behalf of the respondents that he was a Choctaw Indian of the age of 70 years; that he lived and for 70 years had lived about eight miles northeast of the city of McAlester; that he knew Lucy Noel, or Lucy Frazier as she was sometimes called; that he was about 16 or 17 years old when he first knew her; that when he was a small boy he knew her mother; that she and her mother lived four or five miles west of Hartshorne, or about eight or nine miles from McAlester; that Lucy's mother had one child, whose name was Lucy; that Lucy was not quite as old as he was and that he went to school with her at Blanco for three winters; and that he often saw her mother at church. He was asked, "Was her mother's name Alehama, or what was it?" and he answered, "Some name, but you see I was young man, young boy about 16 or 17 years old and I know the woman like I see her yesterday, but I forgot her name, been so long ago." He was then asked and answered, "Q. Well, do you say it wasn't Alehama? A. Yes, I think it was." The answer appears to have been unsatisfactory to Mr. Brunson, who said to the court, "I talked to him about this matter, I think he misunderstood me, I don't want to confuse the witness." The court said, "Let's hear him say," and asked, "What do you think her name was?" The answer was, "Well, you see here, honest truth, I am telling truth in this court, we didn't have no English language names them days." The record does not show that the question was pursued further or that the witness ever changed his testimony, though on cross-examination he was asked and answered, "Q. You say that Lucy's mother's name was something like Alehama? A. Might have been, like I said been so long I can't recollect now, maybe that is what it was, you see we never hardly call it names more than grown people, children, children called it name when they go to school, but I was young boy and forgot whole lot things." It

is apparent that this witness did not know the name of Lucy's mother.

This witness further testified that Lucy had no brothers or no sisters; that he did not know her father; that he did not marry into Lucy's family and was not related to her at all; that he did not keep up with them after the three years he went to school with Lucy; that he did not know any of the other relatives of Lucy; that Lucy did not have any children; and that Wilson Frazier was dead. He was asked, "You don't know what relatives Lucy's mother had before you knew her or after you knew her?" and he answered, "I don't think had any." He testified that "Lucy was an orphan child" and that "got no mother and father died." The court was surprised at that testimony and the record shows questions by the court and answers by the witness as follows:

"Q. Who, Lucy? A. Yes. Q. You said her mother was living? A. She was orphan child, Lucy's mother. Q. Lucy's mother was the orphan child? A. Yes, sir; that is what people used to say in that neighborhood. Q. Lucy's mother was the orphan child? A. Yes, sir, she was raised and she was married and had that child, that is what they ised to temm me, I recollect that."

The witness was further interrogated by the court and answered as follows:

"Q. Let me ask you this, you say Lucy was the only child? A. Only child. Q. The mother had? A. The mother had. Q. Now, did her mother have any children after that time? A. No, I don't think, because Lucy was pretty near grown when left here he didn't have any children. Q. Who die? A. Her mother. Q. Her mother didn't have any more children besides Lucy? A. No, sir; because I used to go over there and go to church, Daniel Pendes father was our preacher and he had church house there and I used to go myself. Q. Did you know Robinson Watson? A. No. Q. Did you know Jimmie Jones? A. I used to know him, I heard his name, Jack Fork. Q. Did you know Elizabeth Lewis? A. No. Q. Could she have had some more children after that without you knowing it or not? A. She was pretty old woman when they moved over there on Brushy and went south. I don't know, might have had it, I don't know."

In their brief the respondents say that this witness testified that the mother of Lucy Frazier was not Alehama. We find nothing in the testimony of this witness to support that statement. The testimony of the witness does not support the further statement of the respondents in their brief that the mother of Lucy had only one child.

The short acquaintance of this witness with Lucy and her mother, coupled with the fact that the witness was in no way related to either of them and that he was not a member of the family of either of them, shows that the statements of the witness are only his conclusions as to the facts. There is nothing in his testimony that can be considered as evidence of who the mother of Lucy was and whether or not the mother of Lucy had other children.

We have quoted extensively from the testimony of this witness for the reason that the trial court, as shown by the record, based the judgment herein on the conclusion of the trial judge that "We have two witnesses who testify positively that they knew Lucy and they knew Lucy's mother and that Lucy's mother was not Alehama, was a different woman." We think that the trial court was in error as to the testimony of the witness, Rufus Winlock, and we find from this record that there were not two witnesses who testified positively that Lucy's mother was not Alehama but was a different woman. The record shows only one witness who so testified and that witness was Wilburn Adams.

Wilburn Adams, the husband of Emaline Adams, one of the respondents, "who owns an interest in a part of it (the land)," testified on behalf of the respondents that he was a Choctaw Indian of the age of 68 years; that he lived about 25 miles south of Hartshorne, and that he had lived close to Hartshorne and in the Choctaw Nation all his life; that he knew Robinson Watson; that the mother of Robinson Watson was Alehama; that the father of Robinson Watson was Willis Watson; that he knew Lucy Frazier, or Noel; that he knew her mother; that the mother of Lucy had just one child; that Lucy lived with Johnson Noel; that after Johnson Noel died she lived with Wilson Frazier and married him; that Lucy's mother and Alehama were sisters; that his wife's name was Emaline; that his wife claims to be one of the heirs to a part of the land; that Lucy Frazier was brought to his house after her mother died by his grandmother when Lucy was about 13; that he did not know the name of Lucy's mother's husband; that Alehama had only one child, Robinson Watson; that Jimmie Jones was not Alehama's son; that he did not think that Lucy had any relations at all; that his kinfolk lived close to Alehama, and that he had forgotten the name of Lucy's mother. He was asked, "How do you know that Lucy's mother and Alehama were sisters?" after which the record shows the following:

"A. Alehama sister Lucy's mother. Q. Was that right? A. Yes, Lucy's mother was Alehama. Q. Was Alehama? A. Yes, Alehama and Lucy's mother were sisters. Q. How do you know that? A. I know it, I used to go down there when we all close together, eat Tom Fuller, it is about 200 yards when they lived there in a log cabin long time ago, we all play, Robinson was older than me, we used to go around back behind and get the ball stick and play, that is all I am acquainted."

He was asked what other sisters Alehama had besides Lucy's mother, and he answered, "I know Alehama's sister was Lucy's mother, that is all I know." He further testified that Lucy's mother died in Gaines county and that Alehama died in Tobucksey county; that he did not attend either funeral; that he was "about eight" when Lucy's mother died and was "a young boy" when Alehama died; that Alehama died first; that Lucy was "about 13" when he first knew her, and that "Lucy was about 14" when her mother died.

An examination of the testimony of Wilburn Adams discloses nothing to support his statement that Lucy's mother and Alehama were sisters and that the mother of Lucy had just one child. According to his testimony both Alehama and Lucy's mother were dead when he was about eight years of age. He made no statement of fact as to how he learned who was the mother of Lucy or that the mother of Lucy was the sister of Alehama. It is impossible for this court to give the statement of this witness the credence given to it by the trial court. Not only did the witness fail to give any reason for the conclusions reached by him, but his testimony is impeached by record evidence. It is difficult to understand why he could remember so distinctly the name of Alehama but could not remember the name of Lucy's mother. He testified positively that he was acquainted with Jimmie Jones; that Jimmie Jones was not Alehama's son, and that Alehama had only one child, Robinson Watson, which testimony is impeached by record evidence. He did not think that Lucy had any "relations at all," but the record in this case shows that Lucy had many relatives.

We do not think it necessary to discuss the testimony of this witness further than to say that, in our opinion, it is not sufficient either to identify or to distinguish two women who passed away when he was a

small child and approximately 60 years before the date of his testimony.

In addition to the two witnesses, Rufus Winlock and Wilburn Adams, there are only two other witnesses who testified for the respondents, one of whom was John P. Savage and the other was D. D. Brunson. Savage testified that he bought the land for $9,000, and that he made no purchase or contract for purchase until after the entry of the decree of the county court as to the heirship and after the order on the appeal to the district court had been made by that court; that he bought it on the faith of the decree of heirship; that he was the agent in buying it; that he bought from Emaline Adams and D. D. Brunson; that he later conveyed to D. D. Brunson; that he was not the owner of any land now but that his daughter is the owner; and that "We have a one-sixth interest in it, my daughter does." This witness did not testify as to the heirship.

D. D. Brunson testified that he bought some of the land from Savage and some of it from Mullen Kemp; that Willis Watson came to his room at Ardmore, after he had bought some of the interests in the land, with H. A. Hicks, a lawyer of Ardmore, and that he made an effort to find out what claim Willis Watson made as to his relationship to the allottee; that Willis Watson said that he did not know, and that Willis Watson said that he thought that he had some interest in the land. This witness did not testify as to the heirship.

The record shows some documentary evidence, among which is a Choctaw Indian census card, No. 4324. That document shows Robinson Watson to be the father of Willis Watson and Richardson Watson and that their mother was Narcissa. It shows the parents of Robinson Watson to be Willis Watson, father, and Ah-le-ha-ma, mother.

Another of the documents is Choctaw Indian census card No. 3006. That document shows the parents of James Jones to be Laymon Jones, father, and Ah-le-ha-ma, mother. This is in direct conflict with the testimony of Wilburn Adams that Alehama was not the mother of James Jones and that Alehama had only one child, Robinson Watson. We think that the finding of the Dawes Commission as to the parentage of James Jones, evidenced by the census card, is entitled to considerably more credit than the statement of the witness (Cox v. Colbert, 135 Okla. 218, 275 P. 317), and that

the finding of that Commission, so evidenced, impeaches the testimony of the witness. If the witness did not know that James Jones was a son of Alehama, he certainly cannot be heard to say that Alehama had only one child, Robinson Watson, and if his knowledge of the parentage of Lucy is not any better than that of the parentage of James Jones, his testimony is entitled to little credit.

One of the documents consists of an order of the probate judge of Pickens county, Chickasaw Nation, under date of July 31, 1903. It recites that Elizabeth Lewis died intestate on October 23, 1902, and appoints Robinson Watson administrator of the estate of Elizabeth Lewis.

A deed from James Jones, Robinson Watson, and Lucy Frazier to A. Eddleman and J. C. Graham recites that James Jones, Robinson Watson, and Lucy Frazier were brothers and sister and the sole heirs at law of Elizabeth Lewis, deceased. That deed was dated August 4, 1903.

The proof of heirship of Elizabeth Lewis, dated July 30, 1913, by Wilson Frazier shows the parents of Elizabeth Lewis to be Ama-cha-tubbee, father, and Ale-hema, mother.

Choctaw census card No. 2978 shows the father of Elizabeth Lewis to be E-ma-cha-tubbe. The name of her mother is not shown thereon.

That Israel Lewis and Elizabeth Jones were married is shown by the circuit court docket and by Choctaw census card No. 2978.

That Elizabeth Atokah was divorced from Simas Atokah on the 12th day of June, 1894, is shown by the records of the First judicial district.

The 1885 census roll shows Johnson Noel, Lucy Noel, Mary Noel, Georgiana Noel, and Robinson Watson to be listed thereon consecutively, and numbered from 113 to 117, inclusive.

The probate record, the deed to Eddleman and Graham, the census card, and the 1885 census roll corroborate the testimony of the witnesses for the petitioners in some particulars and as to some facts.

The proof of heirship of Elizabeth Lewis, dated July 30, 1913, by Wilson Frazier shows the brothers and sister of Elizabeth Lewis to be James Jones, Lucy Frazier, and Robinson Watson. The respondents contend that that proof of heirship has

little, if any, evidential value in this case for the reason that Wilson Frazier made a proof of heirship of Lucy Frazier under date of November 15, 1911, in which, as to the parents of Lucy Frazier, he said, "Don't know, they were old people" and, as to the brothers and sisters of Lucy Frazier, he said, "Don't know them." The petitioners attempt to explain the statements in the Lucy Frazier proof of heirship by saying that therein the parents and brothers and sisters were immaterial for the reason that, as shown therein, Lucy Frazier left a husband and a child surviving her. We do not think that the explanation is satisfactory in view of the fact that, under date of January 13, 1917, Wilson Frazier made a proof of heirship of Lucy Frazier in which he stated the names of her parents to be "Bane," father, and "don't know," mother, and in which he stated the names of her brothers and sisters to be "Elizabeth Lewis." However, that instrument is important in that it shows the father of Lucy Frazier to be "Bane" while the proof of heirship of Elizabeth Lewis by Wilson Frazier shows the father of Elizabeth Lewis to be Ama-cha-tubbee, who, under the record, are different individuals. It is difficult, if not impossible, to reconcile the conflicting statements made by Wilson Frazier in the proofs of heirship or to reconcile them with the statements contained in the proof of heirship of Robinson Watson, dated February 7, 1912, by Narcissa Watson, his wife, in which the names of the parents of Robinson Watson are stated to be Willis Watson, father, and ————, mother, and in which the names of the brothers and sisters of Robinson Watson are stated to be Elizabeth Jones and James Jones. We are unable to understand why Choctaw census card No. 4910, which shows Lucy Frazier to be the wife of Wilson Frazier, shows the names of the parents of Lucy Frazier to be ————.

The documentary evidence in this case shows that Robinson Watson was the son of Willis Watson, father, and Ale-ha-ma, mother; that Robinson Watson was the father of Willis Watson and Richardson Watson, the petitioners herein, and that James Jones was the son of Lyman Jones, father, and Ale-ha-ma, mother. From this we must conclude that James Jones and Robinson Watson were half-brothers, with Ale-ha-ma as their common mother, and that the testimony of Wilburn Adams to the contrary was not correct. The documents show that Elizabeth Lewis died intestate and that her allotment was sold by James Jones, Robinson Watson and Lucy Frazier to A. Eddleman and J. C. Graham; that the title thereto was conveyed by deed signed by those persons, and that that deed recited that James Jones, Robinson Watson, and Lucy Frazier were brothers and sister and the sole heirs of Elizabeth Lewis, deceased. Were they brothers and sisters, or were they only half-brothers and sisters? If they were half-brothers and sisters, did they have a common mother? Evidently James Jones and Robinson Watson had a common mother. Was their mother the mother of Lucy Frazier? Unless she was, the petitioners must fail in this action, for they contend that Alehama, the mother of James Jones and Robinson Watson, was the mother of Lucy Frazier.

We find nothing in the evidence of the respondents or the documents received in evidence from which we can definitely determine who was the mother of Lucy Frazier. For the purpose of determining that question, we must also consider the testimony offered on behalf of the petitioners. We will discuss the same herein only so far as the same pertains to the question of who was the mother of Lucy Frazier.

The first witness offered by the petitioners was Willis Watson, who testified that he was the son of Robinson Watson and the brother of Richardson Watson; that he was 36 years of age; that he was personally acquainted with Lucy Frazier; that Lucy Frazier lived in the same neighborhood with him until her death in 1908; that his father lived in the same neighborhood with Lucy Frazier and about a mile and a half away; that his father and Lucy Frazier many times said that they were brother and sister; that he heard the conversations between his father and Lucy Frazier in 1902 up until the time his father died; that he called Lucy "aunt"; that she called him "nephew"; that they said they were brother and sister "on their mother's side" and that "Alehama was the mother of my father and my aunt"; that they mentioned James Jones and said that he was a half-brother to Lucy on their mother's side and a half-brother to his father; that his Uncle Jim visited them and talked to him and told him "who was my grandmother, says it was Alehama"; that they said that Elizabeth Lewis was a half-sister to his father and that her mother was Alehama; that James Jones was the father of Elizabeth Ludlow; that he knew Georgia Ann Noel during his boyhood and that they called each other "cousin"; that James

Jones called him nephew many times; that his father died when the witness was "about ten years old"; that Lucy Frazier was the mother of Georgia Ann Noel; that his father died "about a couple of years" before Lucy died; that he wrote the letter, exhibit "A"; that he did not know the name of Lucy Frazier before she married Johnson Noel; that he did not know the name of the father of Lucy Frazier; that he did not know Alehama, where she lived, or where she died; that he never saw a Bible or anything like that where they kept a history of the family; that his grandmother's name on his father's side was Alehama; that he never heard anyone talk about who his grandmother was on his mother's side; that he never heard his people discuss any other kinsmen except Alehama; that he never heard Lucy Frazier discuss any other kinsman except Alehama; that he never heard James Jones discuss any other kinsman except Alehama; that he never heard Elizabeth Lewis discuss any other kinsman except Alehama because she was dead; that he talked with Mr. Brunson in Ardmore; that he wrote exhibit "A" at the suggestion of his attorney, Mr. Disney; that he first learned of the determination of heirship when someone told him that Wilson Frazier, Jennie Kemp, and Emaline Adams has sold the land of Rena Noel, "and so I said 'Well, I ought to get my part out of that, out of this Rena Noel estate' "; that he then went to the probate attorney at Ardmore and the field clerk, and that they told him about the situation and advised him to let it alone and that they would look into it.

The testimony of this witness consists largely of conversations that he had with his relatives and conversations that he overheard between his relatives many years ago and when he was but a small child. The statements that he made were not denied and they are not in conflict with the record evidence in the case. While the evidence is not of the highest type, it must be given some consideration.

Nelson Pickens, 65 years of age, testified through an interpreter that he knew Wilson Frazier, Lucy Frazier, and Robinson Watson; that he heard Robinson Watson and Lucy Frazier say that they were brother and sister; that he heard that "Robinson used to say that Lucy was his sister," but that he did not hear Robinson say so; that he heard Lucy say that Robinson was her brother when he was a young boy, and that his grandmother said that Lucy Frazier and Robinson Watson were brother and sister. He was asked:

"Ask him if children of brothers were not called brothers, if two brothers had children if their children didn't call each other brothers in Choctaw?"

—after which the following occurred:

"A. (By the Interpreter: I believe I have to explain that before he can answer. You say two brothers had children and whether Choctaw say they call each other brothers?) Q. Yes? A. Call each other brothers. By the Court: Let me ask the interpreter a question right there: Are there two separate words in the Choctaw language to distinguish cousin and brothers, or do you just use the same term like they do in the Creek, I find in interpreting in Creek I find there seems to be one word up there? By the Interpreter. No, separate. The Court: You have a distinct word, do you, for cousin and brother? The Interpreter: Yes. The Court: Is there generally used among the full-bloods, do they have two separate words? The Interpreter: Yes. The Court: Q. Let me ask a question now in connection with what was just said. When Lucy said she was a sister to Robinson, what kind of a sister did she mean, did she mean she was a sister by having the same father and mother or sister by her father and mother being related to Robinson's father and mother, which way did she mean to tell you? A. No, he says he could not tell about that for he don't know. Just knows Lucy told, he heard Lucy say that and somebody talk about it, that is all. He didn't know just whether father and mother were the same or not."

He further testified that he did not hear Lucy say who her mother was; that he did not know what Lucy's name was before she married Johnson Noel; that he did not know Alehama, and that he did not know when Lucy's mother died.

This testimony is shown in part as corroborating that of Willis Watson, but principally for the purpose of showing the error of the trial court as to the effect of the evidence given. The trial court, at the conclusion of the trial, said:

"The question is whether or not she was a real sister to them, or whether or not she was a sister in the sense that the Indians use that term so frequently as a cousin or near relative. It seems that they use that often and call a cousin a sister, especially since this party was taken in the family."

That statement of the trial court conflicts with the record quoted, and this court, under the record in this case, is not warranted in saying that the parties used the

term "sister" to designate a cousin. Such may be the Choctaw Indian custom, but if so, it is not shown by this record and the record is in conflict therewith. This court is bound by the record. There is no question of judicial knowledge for this court has no judicial knowledge of any such custom.

Simon Atohka, 57 years of age, testified through an interpreter that he knew James Jones, who was sometimes called Jimmie Jones, for about 40 years; that Elizabeth Lewis was his wife for about five years and that they were divorced; that after that Elizabeth Lewis married Israel Lewis; that at the time he married Elizabeth Lewis she went by the name of Elizabeth Beams and that she was sometimes called Elizabeth Jones; that the name of Elizabeth's mother was Alehama; that Alehama died about a year after he married Elizabeth Lewis; that Alehama visited at their house; that he did not go to her funeral, but that his wife did; that, after he married Elizabeth, Elizabeth told him that Alehama was her mother; that when Alehama was sick and Elizabeth would go to see her, Elizabeth Lewis "would say this woman was her mother, several times, more than once"; that Jim Jones lived a half mile from him and Elizabeth; that Elizabeth told him that Jim Jones was her brother through her mother's side; that he knew Robinson Watson; that he knew Lamon Jones; that Lamon Jones was Jim Jones' father; that Lamon Jones lived about half a mile from him; that Robinson Watson lived with him and Elizabeth; that Elizabeth told him that Robinson Watson was her brother; that Robinson Watson told him that Elizabeth was his sister; that Robinson Watson said that his mother's name was Alehama; that Elizabeth Lewis called Jim Jones "brother"; that Jim Jones called Elizabeth "sister"; that Robinson Watson called Elizabeth "sister"; that Elizabeth called Robinson "brother"; that Lucy Frazier visited him and Elizabeth and that "Elizabeth, when they lived near Savanna used to bring her here and she got on the train and visit Lucy"; that Elizabeth said that Lucy was her sister; that she called Lucy "sister"; that Lucy called Elizabeth "sister"; that Elizabeth "used to say that Alehama was her mother and was sister by mother"; that Robinson Watson lived at his place and Jim Jones' place and Lucy's place before he was married; that Elizabeth Lewis had a husband by the name of Alex Lewis, before she married the witness, with whom she lived for about four years; that Elizabeth first mar-

ried Alex Lewis, then married the witness, and that Israel Lewis was her third husband; that Elizabeth used to say that her father was Beam; that Lucy Frazier visited his house "a whole lot, maybe 40 times, maybe more;" that at that time she was about 30 years old and single; that she visited him only one time when she brought a child; that the Indians would gather at the church from all over the country and call each other brother and sister whether they were in fact brother and sister by blood or not; that he knew the mother of Lucy, because "Lucy, Jimmee Jones and others used to say that she was their mother"; that Alehama was the mother of Elizabeth, Lucy, Jimmie Jones, and Robinson; and that when Alehama came to visit him and Elizabeth she was brought there by Lucy.

That testimony is from a disinterested witness. He was a member of the family and he acquired his information as such; his age at the time he testified was such as to warrant this court in relying upon the statements made by him; his testimony is positive as to the facts and positive as to the pedigree of the family.

The trial court evidently overlooked the testimony of this witness, or for some reason undisclosed by the record disregarded it, for in the discussion of the evidence no reference thereto was made.

We think that the testimony of this witness should be given greater weight and credit than that given to the testimony of Wilburn Adams, not only by reason of his opportunity to know that of which he spoke, but by reason of the fact that he gave the source of his information, which Adams failed to do. It is hardly probable that the witness could be mistaken as to the conversations which he had and the conversations which he overheard between the members of the family. We find nothing in the record to warrant us in disregarding the testimony.

A. Eddleman, an attorney, testified that he was acquainted with Robinson Watson and Lucy Frazier; that he and J. C. Graham were partners; that they filed allotments for Robinson Watson, Lucy Frazier, James Jones and Elizabeth Lewis, deceased, and bought the allotment of Elizabeth Lewis sometime thereafter from James Jones, Robinson Watson, and Lucy Frazier; that Robinson Watson, James Jones, Wilson Frazier, Lucy Frazier, and some others were on the train with him when Robinson Watson and James Jones

mentioned Elizabeth Lewis and wanted to know about filing for an allotment for her; that Elizabeth Lewis was a half-sister to Lucy Frazier, James Jones, and Robinson Watson, and that Lucy Frazier, James Jones and Robinson Watson, all three, told him so; that Wilson Frazier also told him so; that Robinson Watson, Lucy Frazier, James Jones, and Elizabeth Lewis are all dead; that they all stated that they had the same mother; that Lucy Frazier's relationship to the others was brought into the conversation as follows:

"A. First, I was sitting next to Robinson Watson and James Jones in the car—as I recall the seat was reversed and facing us. Back three or four seats, Wilson Frazier and Lucy were sitting. Part of the time Wilson Frazier was up there with us and part of the time he wasn't. We were talking, and Wilson Frazier heard the conversation between Robinson Watson, James (Watson, James Jones, and myself. Up to this time they hadn't mentioned Lucy as being a sister of Elizabeth Lewis, and Wilson called me, I went back to where he and' his wife were sitting, and he told me Lucy was also a sister of Elizabeth Lewis, and I said 'Is that so?' 'Yes.' So I got up and came back to where Jones and Robinson were and said 'Wilson tells me Lucy is a sister of Elizabeth also,' and they said, 'Yes, sir, she is.' Q. Who said 'Yes.' * * * (Objection and order.) * * * Q. All right, who said 'Yes, she is' or the expression you just used? A. They both assented to that proposition. I don't remember just what language they used. Q. Who? A. James Jones and Robinson Watson. Q. What, if anything, did Lucy say? A. She said she was a sister—that Elizabeth Lewis was her sister."

—that he had no interest in the matter, and that he was not an attorney therein; that the conversation took place "I think it was 1902"; that he investigated the record of the Dawes Commission and that from the information he received he purchased the land of Elizabeth Lewis from those parties, and that he could not say whether they told him their mother's name or not.

That testimony speaks for itself. It was from a disinterested witness who invested his money on the information received by him and detailed therein.

The letter herein referred to as exhibit "A" is as follows:

"May 6, 1926.
"Mr. Wilburn Adams,
"Blanco, Okla.
"Dear Mr. Adams: About my kinfolks and

what we were talking about at McAlester, can you tell me the last name of a brother named Isaac that Lucy Frazier is said to have had? I would like to learn his last name so as to trace my family better.

"Also, can you tell me what Lucy Frazier's name was before she married Johnson Noel, and do you know her father's name? If you can remember the name of her father and mother I would like to know and especially what was her last name before she married Johnson Noel. I am sending you an addressed envelope and would appreciate it very much if you would just take the trouble to tell me what you know about these names on the bottom of this as soon as you can.

"Yours truly,
"Willis Watson"

We see nothing therein to impeach the testimony of Willis Watson.

It is highly probable that James Jones, Robinson Watson, and Lucy Frazier were brothers and sister, or there would have been no division among them of the proceeds of the sale of the allotment of Elizabeth Lewis. We cannot assume that they would make a division thereof not required by law to be made. James Jones, Robinson Watson, Elizabeth Lewis, and Lucy Frazier were not all brothers and sisters, for the father of James Jones was Laymon Jones, the father of Robinson Watson was Willis Watson, and the father of Elizabeth Lewis was E-ma-cha-tubbe. If neither Laymon Jones, Willis Watson nor E-ma-cha-tubbe was the father of Lucy Frazier, then James Jones, Robinson Watson, Elizabeth Lewis, and Lucy Frazier were not brothers and sister, and they were not half-brothers and half-sister unless they had a common mother. Since the mother of James Jones and Robinson Watson is shown to have been Alehama, James Jones and Robinson Watson were not half-brothers of Elizabeth Lewis, unless Alehama was also the mother of Elizabeth Lewis, and they were not half-brothers of Lucy Frazier, unless Alehama was the mother of Lucy Frazier, or the father of Lucy Frazier was the father of one of them. Who was the father of Lucy Frazier? Apparently that was what Willis Watson was trying to ascertain when he wrote the letter referred to as exhibit "A." Wilson Frazier, in the proof of heirship of Lucy Frazier, said that the name of the father of Lucy Frazier was "Bane." Siman Atohka testified that when he married Elizabeth Lewis her name was "Bean." If that was so, then Elizabeth Lewis and Lucy Frazier were at least half-sisters with a

common father, "Bane" or "Bean." That would account for the interest of Lucy Frazier in the allotment of Elizabeth Lewis, but it would not show whether Lucy Frazier and Elizabeth Lewis were half-sisters through a common father or full sisters through a common father and a common mother. If the proof of heirship of Elizabeth Lewis by Wilson Frazier is correct, Alehama was the mother of Elizabeth Lewis. If she was the mother of Elizabeth Lewis, then Elizabeth Lewis, James Jones and Robinson Watson were half-brothers and sister with a common mother, and if Alehama was not the mother of Lucy Frazier, and Lucy Frazier and Elizabeth Lewis had a common father, Elizabeth Lewis and Lucy Frazier were half-sisters with a common father. In order to show that James Jones and Robinson Watson were even the half-brothers of Elizabeth Lewis, the statement of Wilson Frazier that Alehama was the mother of Elizabeth Lewis must be taken as true, for, if Alehama was not the mother of Elizabeth Lewis, neither James Jones nor Robinson Watson were either the brothers or the half-brothers of Elizabeth Lewis, and neither of them was entitled to share in the estate of Elizabeth Lewis. The transfer of the allotment of Elizabeth Lewis by the deed to Eddleman and Graham therefor must be given force and effect, for thereby James Jones, Robinson Watson, and Lucy Frazier acknowledged themselves to be brothers and sister. They could not both have been brothers of Lucy Frazier unless Alehama was the mother of Lucy Frazier for though Laymon Jones was the father of Lucy Frazier, Lucy Frazier would not have been a half-sister of Robinson Watson, and though Willis Watson had been the father of Lucy Frazier, Lucy Frazier would not have been a half-sister of James Jones. The record shows the children of Laymon Jones and it shows the children of Willis Watson, and the record does not show that Lucy Frazier was the child of either Laymon Jones or Willis Watson. If the record shows the name of the father of Lucy Frazier, it was "Bane." We are forced to one of three conclusions, that James Jones, Robinson Watson and Lucy Frazier did not know what they were doing when they signed the deed to Eddleman and Graham, that their relationship was such that they desired to divide with each other property in which at least some had no interest, or that Alehama was the mother of Lucy Frazier. We cannot follow the first conclusion, under the evidence, for Eddle-

man testified that he received the information contained in the deed from them. They certainly knew what they were doing. We cannot assume that Lucy Frazier, the half-sister of Elizabeth through a common father and the sole and only heir of the estate of Elizabeth, would give two-thirds of that estate to Robinson Watson and James Jones, and we cannot assume that Robinson Watson and James Jones, the half-brothers of Elizabeth through a common mother and the sole heirs to the estate of Elizabeth, would give one-third of that estate to Lucy Frazier. We must conclude that Alehama was the mother of Elizabeth Lewis, Lucy Frazier, Robinson Watson, and James Jones.

That conclusion conforms to the unimpeached testimony of Willis Watson, Nelson Pickens, Simon Atohka, and A. Eddleman, all of whom received their information from members of the family in conformity with the rule followed in Bell v. Bearman, 37 Okla. 645, 133 P. 188; O'Neill v. Lauderdale, 80 Okla. 170, 195 P. 121; In re Estate of McDade, 95 Okla. 120, 218 P. 532; Mandler v. Harvey, 119 Okla. 185, 249 P. 391; Neustadt v. Coline Oil Co., 141 Okla. 113, 284 P. 52, and Frank v. Arjo, 142 Okla. 157, 286 P. 14.

The determination of this action required an examination of a large record in order to determine whether or not the judgment of the trial court is against the clear weight of the evidence, which the petitioners assert in their brief. We think that it is, and that the trial court evidently fell into error by failing to consider the testimony of Simon Atohka and in concluding that Choctaw Indians meant "cousins" when they said "brother" and "sister."

The judgment of the district court of Pittsburg county is reversed and the cause is remanded to that court, with directions to enter a judgment decreeing Jennie Kemp, Emaline Adams, Willis Watson, and Richardson Watson to be the next of kin and sole heirs at law of Rena Noel, deceased, with the provision that the interest of Jennie Kemp in any property owned by Rena Noel, at the time of her death, shall be given to Mullen Kemp, her son and Stanton Kemp, her husband, as provided by the applicable statutes of Oklahoma and for further proceedings not inconsistent herewith.

CULLISON, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and CLARK, V. C. J., dissent. RILEY, J., not participating. HEFNER, J., absent.